**MAYES, Collector of Internal Revenue, v. UNITED STATES TRUST CO.**

(Circuit Court of Appeals, Sixth Circuit.   April 4, 1922.)

No. 3549.

1. **Appeal and error** ⊂⇒997(3)—**Trial** ⊂⇒177—**Motion by both parties for directed verdict submits determination of facts to court, and its conclusion must stand, if supported by substantial evidence.**

Where each party moved for a directed verdict, and the motion of the party against whom verdict was directed was unaccompanied by a request for specific instructions in case the request was denied, the parties thereby submitted to the judge the determination of the inferences to be drawn from the facts, and his conclusion of fact must stand, if supported by any substantial evidence.

2. **Internal revenue** ⊂⇒9—**That amount equal to capital, surplus, and undivided profits invested in building and securities does not show capital wholly withdrawn from banking business.**

Under War Revenue Act Oct. 22, 1914, § 3, subd. 1, imposing a tax on bankers, measured by the capital used or employed, the fact that an amount equal to a trust company's capital, surplus, and undivided profits was permanently invested in its office building and public securities had no tendency to show that its capital was wholly withdrawn from its banking business, as such permanent investments secured its creditors in its trust business and banking business.

3. **Internal revenue** ⊂⇒9—**Capital employed in banking business properly measured by ratio of banking assets to total assets.**

In the absence of proof of a more satisfactory method, the capital employed by a trust company in its banking business was properly measured for the purpose of determining the tax under War Revenue Act Oct. 22, 1914, § 3, subd. 1, by the ratio which the assets in the banking business bore to the assets employed in the aggregate business.

4. **Internal revenue** ⊂⇒38—**Evidence held to warrant inference that not more than one-half of trust company's capital was employed in banking business.**

In a trust company's action to recover a tax paid under protest, under War Revenue Act Oct. 22, 1914, § 3, subd. 1, evidence as to the amount of its average capital, surplus, and undivided profits, the average amount of its trust funds and the average deposits, loans, and discounts, etc., *held* to warrant the inference by the court, on motion by each party for a directed verdict, that not more than one-half of its capital was employed in its banking business.

In Error to the District Court of the United States for the Western District of Kentucky; Walter Evans, Judge.

Action by the United States Trust Company against T. Scott Mayes, Collecter of Internal Revenue.   Judgment for plaintiff, and defendant brings error.   Affirmed.

W. V. Gregory, U. S. Atty., of Louisville, Ky. (Gordon Auchincloss, Sp. Asst. Atty. Gen., on the brief), for plaintiff in error.

Percy N. Booth, of Louisville, Ky. (Booth, McDowell & Conner, of Louisville, Ky., on the brief), for defendant in error.

Before KNAPPEN, DENISON, and DONAHUE, Circuit Judges.

KNAPPEN, Circuit Judge.   Subdivision 1 of section 3 of the War Revenue Act of October 22, 1914 (38 Stat. c. 331, p. 750), imposed upon bankers an annual tax of $1 for each $1,000 of capital used or em-

⊂⇒For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

ployed, including surplus and undivided profits. The term "banker" was made to include "every person, firm, or company * * * having a place of business where credits are opened by the deposit or collection of money or currency, subject to be paid * * * upon draft, check, or order, or where money is * * * loaned on * * * bonds, * * * bills of exchange, or promissory notes. * * *" Plaintiff was incorporated in the year 1902 under the laws of Kentucky, with authority, not only to carry on a "general trust and finance business," but also (among other things) to receive money on deposit and pay interest thereon, and to loan money upon such securities as it may approve. The trust company, which was plaintiff below, not only carried on a general trust business, but received deposits subject to check, as well as on certificates, and made loans secured by collateral or mortgage. For the fiscal year 1915 plaintiff was assessed $312, being two-thirds of what would be the annual tax upon its entire capital, surplus, and undivided profits.[1] For the first half of the fiscal year 1916 it was assessed $230.50, being one-half of the annual tax. This suit against the collector is to recover (with interest) the amount of these taxes, paid under protest. At the close of the testimony each party moved for a directed verdict in its favor. Verdict was thereupon rendered for plaintiff, under the direction of the court, for one-half the amount sued for, and judgment was entered accordingly.

[1] Defendant alone seeks review. The record indicates that its motion for directed verdict was unaccompanied by request for specific instructions in case the request for directed verdict was denied. By these mutual requests for directed verdict the parties submitted to the trial judge the determination of the inferences proper to be drawn from the facts submitted, and upon this review the court's conclusion of fact must stand, if the record discloses any substantial evidence to support it. Williams v. Vreeland, 250 U. S. 295, 298, 39 Sup. Ct. 438, 63 L. Ed. 989, 3 A. L. R. 1038, and cases there cited, including American National Bank v. Miller (C. C. A. 6) 185 Fed. 338, 341, 342, 107 C. C. A. 456. And see Moore v. Fain (C. C. A. 6) 251 Fed. 573, 574, 163 C. C. A. 567; and La Crosse Co. v. Pagenstecher (C. C. A. 8) 253 Fed. 46,[2] 165 C. C. A. 644.

[2, 3] It clearly appears from what has already been said that plaintiff was engaged in banking, and so was subject to the tax upon its capital employed in that business. (We shall use the term "capital"

---

[1] Only two-thirds of a fiscal year remained after November 1, 1914, when liability to tax accrued.

[2] After verdict had been directed for plaintiff, but before the jury had retired, defendant presented further requests to charge, which were denied, as coming too late. This ruling was proper. After the court, upon a valid submission for the purpose, had announced its conclusion upon the facts, it was too late to insist upon submission to the jury. Had defendant accompanied its motion to direct verdict with request for specific instructions in case its motion to direct were denied, or had plaintiff not also simultaneously presented motion to direct verdict in its favor, the situation would have been different. Breakwater Co. v. Donovan (C. C. A. 6) 218 Fed. 340, 343, 134 C. C. A. 148; Michigan Co. v. Chicago Co. (C. C. A. 6) 269 Fed. 502, 504.

as including surplus and undivided profits.) That plaintiff had some amount of capital employed in banking is equally clear. The fact, as asserted by plaintiff, that an amount equal to its capital, surplus, and undivided profits was permanently invested in its office building and in public securities has no tendency to show that its capital was wholly withdrawn from the banking business. These permanent investments equally secure plaintiff's creditors in the trust business and the banking business. Plaintiff was thus liable to taxation on the amount of capital employed in the banking business; and, at least in the absence of proof of a more satisfactory method, the capital so employed was properly measured by the ratio which the assets employed in the banking business bore to the assets employed in the aggregate business. Anderson v. Farmers' Loan & Trust Co. (C. C. A. 2) 241 Fed. 322, 327, 328, 154 C. C. A. 202; Real Estate, etc., Co. v. Lederer (C. C. A. 3) 263 Fed. 667; Germantown Co. v. Lederer (C. C. A. 3) 263 Fed. 672. The difficulty lies in apportioning the assets between the trust and the banking businesses. The assessment was presumptive evidence of its correctness. It was open to the plaintiff, however, to show the contrary; but the burden rested upon it to do so, and, if it failed, it was not entitled to recover.

[4] Upon this record, it is obvious that less than plaintiff's entire capital was employed in banking. To show with absolute mathematical exactness the amount so employed is manifestly difficult, if not practically impossible; but it should, we think, be reasonably possible to show facts from which reasonable inferences may fairly be drawn. We are disposed to think that plaintiff has presented such data. It appeared that during the first taxation period plaintiff's average capital (which includes surplus and undivided profits, and of course is the difference between its assets and liabilities) was $486,000,[3] and during the second period, $461,000; that during both the first and second periods the average amount of trust funds was upwards of $4,000,000; that during the first taxation period the average deposits were $692,000, and during the second, $675,000; that its loans and discounts, which were made from deposits, averaged during the first period, $389,000 and during the second, $365,000; that during the first period the trust cash amounted to $203,000, and during the second, to nearly $109,000. The amount of the trust funds was thus between six and seven times the amount of the deposits. A portion at least of the office building was used for both the trust and the banking business, and it does not definitely appear what proportion of the office space was devoted to banking alone. But plaintiff's president (who was the only witness in the case), replying to a request to give (based on the figures he had submitted) the amount of the trust business during the two fiscal years as compared with the amount of the banking business, stated that the trust business was about six-sevenths and the banking end one-seventh.

This estimate was apparently based largely, if not entirely, upon the moneys employed in the respective branches of the business; but, in

---

[3] Throughout these figures we use only round numbers.

the absence of a better method of determining the ratio of capital employed in each business, we are unable to say that the testimony had no substantial tendency in that direction, having in mind the knowledge presumably possessed by the president of the relative earnings in the two departments and of their relative importance, and having in mind that apportionment of overhead expenses (such as rental use, upkeep, supervision, and perhaps to some extent clerk hire) would be largely a matter of estimate, and perhaps in some respects more or less arbitrary, unless on the basis of business transacted. We therefore think the evidence would fairly enable an inference to be drawn, within reasonable limitations, of the amount of capital employed in banking. If it would support an inference by the jury, it would equally support an inference by the judge upon a submission such as was made here. The trial judge, for some reason which is not apparent, determined that one-half plaintiff's capital was employed in the banking business. We need not determine whether that conclusion would be sustainable against complaint by plaintiff. It seems enough to say that, in our opinion, there was substantial evidence tending to support the conclusion that not more than one-half plaintiff's capital was employed in banking, and thus that defendant is not prejudiced by the finding.

This being so, the judgment should be affirmed.